IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LATIA BROWN, | ) | CASE NO. 1:14-cv-00720 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Latia Brown ("Plaintiff" or "Brown") seeks judicial review of the final decision
of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her
applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant
to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the
consent of the parties.  Doc. 15.  The Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Brown protectively filed applications for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI") on September 28, 2010.[1]  Tr. 10, 111, 122, 234-244, 266.
She alleged a disability onset date of June 20, 2009.  Tr. 10, 236, 266.  During the hearing,
Brown, through counsel, amended her alleged onset date to June 24, 2009.  Tr. 10, 11, 39.
Brown alleged disability based on HIV, lower back problems, bipolar disorder, and depression.
Tr. 111, 122, 167, 187, 270.  After initial denial by the state agency (Tr. 167-180), and denial

---

[1]The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/16/2015).

upon reconsideration (Tr. 187-200), Brown requested a hearing (Tr. 201-205).  On February 13, 2012, Administrative Law Judge Cheryl M. Rini ("ALJ") conducted an administrative hearing. Tr. 33-89.

In her January 10, 2013, decision (Tr. 7-32), the ALJ determined that Brown had not been under a disability from June 24, 2009, the amended alleged onset date, through the date of the decision.  Tr. 10-26.  Brown requested review of the ALJ's decision by the Appeals Council. Tr. 5-6.  On February 26, 2014, the Appeals Council denied Brown's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence[2]

### A.  Personal, educational and vocational evidence

Brown was born in 1966.  Tr. 43-44, 169, 176.  Brown has three minor children, ages seven, five and three at the time of the hearing.  Tr. 49.  In March 2011, Brown was upset after receiving reports from the school regarding her son, age six at the time.  Tr. 50.  When her son returned from school, Brown questioned her son about the reports and Brown believed that her son was lying and she started spanking him.  Tr. 50.  He ran behind the television; Brown continued to spank him; and he hit his head on the television and ended up requiring stitches on his face.  Tr. 50.  As a result of the March 2011 incident, a case was opened with Children and Family Services.  Tr. 49-50.  In September 2011, Brown stuck a knife to her son's throat.  Tr. 49. Her son was not injured.  Tr. 49.  Brown reported blacking out but she called Children and Family Services herself.  Tr. 49-51.  When the social worker interviewed her children, her son and daughter told the social worker what had happened and indicated that Brown had become upset with her son because he was not getting his homework correct and had received a bad

---

[2] Brown does not challenge the ALJ's findings regarding her alleged physical impairments.  Doc. 17, p. 3. Accordingly, the Court's summary of the evidence is generally limited to evidence relating to Brown's alleged mental impairments.

interim report.  Tr. 51-52.  Children and Family Services removed Brown's children from her home at that time and they were returned to her home in December 2011.[3]  Tr. 49-50.

Brown completed the 12th grade but was unable to earn her high school diploma because she was unable to pass the math proficiency test.  Tr. 64.   Although she was unable to obtain her high school diploma, she was able to pass a test that allowed her to start classes at Tri-C.  Tr. 64.  She attended Tri-C from 2007 until 2008 and studied law.  Tr. 64.   In 2008, Brown indicated that her grades started to fall due to a number of issues, including mental health issues and being pregnant with her third child.  Tr. 64.  Because her grades fell, she lost her financial aid and was unable to continue with school.  Tr. 64-65.

Brown worked as a daycare worker in her aunt's daycare facility in 2008, 2009, and 2010.  Tr. 62-66.  Brown worked first shift, i.e., from 8:00 a.m. until 2:50 p.m. taking care of children ages nine month to one year.  Tr. 62, 65.  While at work, Brown's oldest son was in school and her two younger children were in another daycare.  Tr. 63.  Before starting work, Brown dropped her children at school and/or daycare and she picked them up once she was out of work.  Tr. 63.  While working at the daycare center, she was also attending school at Tri-C.  Tr. 63.

## B.     Medical evidence

### 1.  Treatment history

On January 21, 2011,[4] Brown underwent a psychiatric evaluation by Stephanie Martin, APN, at the Murtis H. Taylor Multi-Service Center ("Murtis Taylor").  Tr. 921-926.  Brown

---

[3] While the children were removed from Brown's home, they were placed with Brown's mother.  Tr. 49.

[4] Medical records prior to 2011 reflect evaluation of and/or diagnoses regarding Brown's mental health.  In August 2009, Brown sought treatment at an emergency room for complaints of pain.  Tr. 958-959.  During that emergency room visit, a psychiatric consult was requested because Brown reported depression.  Tr. 958.  She had denied thoughts of suicide.  Tr. 958.  On discharge, Brown's diagnoses were HIV and depression.  Tr. 958.  Also, on August 25, 2010, Brown sought emergency room treatment for complaints of pain.  Tr. 966-968.  Treatment notes

reported a history of depression, anxiety and anger starting in her teenage years.  Tr. 921.  She

reported having been diagnosed with bipolar disorder, mixed, in 2009 and HIV in 2006.  Tr. 921.

In 2006, Brown tried to cut her wrists but was stopped by her mother and, in 2010, Brown

attempted an overdose.  Tr. 921.  Brown complained of depression, anxiety that "comes and

goes," racing thoughts, getting off-track at times, and being paranoid at times "about strangers

out on street."  Tr. 923.  Brown reported no problems with memory and denied hallucinations.

Tr. 923.  Brown had not been taking medication but indicated a willingness to take lithium for

mood stabilization.  Tr. 926.  Ms. Martin assessed bipolar disorder, NOS and a GAF score of

50.[5]  Tr. 924.  Ms. Martin started Brown on lithium.  Tr. 924, 926.

Upon self-referral, on August 31, 2011, Brown sought counseling through Berea

Childrens Home and Family Services ("BCHFS").  Tr. 1169-1207.  An Adult Mental Health

Assessment was completed.  Tr. 1169-1191.  Brown indicated she was seeking services through

BCHFS to help her with her parenting skills.  Tr. 1169.  Brown reported having received

outpatient care through Murtis Taylor and she had been diagnosed with bipolar disorder and

prescribed Seroquel.  Tr. 1169.  Brown indicated she stopped taking the medication because it

made her very sedated and she could not care for her children.  Tr. 1169.  Brown reported a

"chronic history of explosiveness, irritability, a feeling of losing control, and intermittent

auditory hallucinations."  Tr. 1169.  Brown feared harming her children during an explosive

---

from that visit reflect that Brown's past medical history included HIV and depression but reflect "[n]o change in psychiatric status."  Tr. 966.  In September 2010, Brown was admitted to a skilled nursing facility for treatment of an intraspinal abscess.  Tr. 372.  Brown's discharge summary from the skilled nursing facility reflects diagnoses of spinal abscess, HIV and bipolar disorder.  Tr. 371.

[5] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

episode.  Tr. 1169.  She indicated that the Department of Children and Family Services was involved with her family because of an incident involving one of her children in May of that year.  Tr. 1169.  Following an assessment, diagnoses included affective psychosis, NOS.  Tr. 1190.  Brown's GAF score was 45.  Tr. 1190.

Following an October 2011 incident in which it was alleged that Brown placed a knife to her son's neck, Brown's children were temporarily removed from her home.  Tr. 1125, 1148-1151.  Brown was thereafter seen on October 21, 2011, at Catholic Charities by Cheryl Wills, M.D., for a psychiatric evaluation.[6]  Tr. 1125-1128.  Dr. Wills indicated that Brown presented as an obese female in emotional distress who appeared distressed and overwhelmed and at times was tearful and irritable.  Tr. 1127.  Dr. Wills' diagnoses included major depressive disorder, recurrent with psychosis and PTSD, chronic.  Tr. 1127.  Dr. Wills assessed a current GAF score of 50.  Tr. 1127.  Dr. Wills indicated that Brown's highest GAF score in the past year was 60.[7]  Tr. 1127.  Dr. Wills prescribed Prozac.  Tr. 1128.  Dr. Wills' assessment included a Beck Depression Inventory ("BDI").[8]  Tr. 1127-1132.  Brown's BDI score was a 55, correlating to severe depression.  Tr. 1132, 1134.

Brown subsequently saw Dr. Wills on October 26, 2011 (Tr. 1124), November 16, 2011 (Tr. 1122-1123), and December 23, 2011 (Tr. 1117-1120).  During her November 16, 2011,

---

[6] Brown was continuing to and received services through BCHFS until November 2011 when she started receiving counseling through Catholic Charities, as required by the Department of Children and Family Services.  Tr. 1207.  Brown's a BCHFS Mental Health Discharge Summary reflects that Brown had "made progress exploring triggers to her anger, and was able to identify antecedents/consequences to inappropriately expressing anger."  Tr. 1207.  She had sought medication to help decrease her feelings of depression.  Tr. 1207.  The discharge summary also reflects that Brown had made progress on her goals but no goals had been met yet due to her case being terminated early.  Tr. 1207.  However, it was noted that Brown had been able to develop a "healthy 'plan of action'" for when she was feeling overwhelmed.  Tr. 1207.

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[8] The Beck Depression Inventory "is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression."  *See* http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx (last visited July 16, 2015).

visit, Brown indicated that her home had been robbed.  Tr. 1123.  She had been without

medication for a few days because the robbers took her medication.  Tr. 1123.  Her home had

been a "safe haven" for her until the incident.  Tr. 1123.  Brown indicated that the robbers had

tried to return that week and broke another window when she was home.  Tr. 1123.  She had

slept well the prior night because a friend stayed with her.  Tr. 1123.  She remained irritable and

missed her children who had been with Brown's mother.  Tr. 1123.   In December 2011, Brown

indicated she was continuing to have flashbacks of her house being burglarized.  Tr. 1118.  She

had thoughts of hurting the people who had robbed and betrayed her but had no plans or intent to

do so because she did not want to jeopardize her relationship with her children.  Tr. 1118.

On November 30, 2011, Roy A. Szubski, LISW, LICDC, a Clinical Supervisor social

worker with Catholic Charities, authored a "To whom it concerns" letter wherein he indicated

that he was Brown's counselor/therapist and had seen her three times since November 7, 2011.

Tr. 1160-1162.  Mr. Szubski stated that he "initially found Ms. Brown very depressed and

anxious, worried about her children and about what she did which caused the children to be

taken into custody."  Tr. 1160.  Mr. Szubski had reviewed Dr. Wills' Mental Functional Capacity

Assessment and agreed with her conclusions.  Tr. 1160 (referring to Dr. Wills' diagnoses of

recurrent major depression with psychotic features and PTSD and Dr. Wills' notes that

"community stress sets off (triggers) flashbacks of past abuse.  She can be hyper-vigilant, has

emotional numbing, and had flashbacks on 10/17/11 when her child upset her.").  Mr. Szubski

stated that he believed that, if Brown confronted her PTSD, she would learn to deal with her

anger as well as her need to hear the reassuring voice of her deceased uncle whom Brown had

thought of as a father.  Tr. 1160, 1161.

## 2.  Medical opinions

### a.  Treating psychiatrist

On October 21, 2011, Cheryl D. Wills, M.D., completed a Mental Functional Capacity Assessment for Ohio Job & Family Services.  Tr. 1133-1137.  Dr. Wills indicated that Brown was markedly limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 1136.  Dr. Wills also indicated that Brown was moderately limited in a number of other work-related abilities.  Tr. 1136.  Dr. Wills indicated that Brown was too depressed and traumatized at that time to work and suggested reassessment of her condition in 18 months.  Tr. 1135, 1136.

On February 10, 2012, Dr. Wills completed a Medical Source Statement.  Tr. 1212-1217. Dr. Wills reported having seen Brown on October 21, 2011, October 26, 2011, November 16, 2011, December 23, 2011, and February 10, 2012.  Tr. 1212.  Dr. Wills noted that Brown had missed an appointment in January because one of her children was in the hospital.  Tr. 1212.  Dr. Wills' diagnoses included post-traumatic stress disorder and major depressive disorder, recurrent with psychotic features.  Tr. 1212.  Dr. Wills indicated that Brown's current GAF score was 53 and her highest GAF score in the past year was 60.  Tr. 1212.  Dr. Wills indicated that she had treated Brown with anti-depressants and anti-psychotic medication and Brown had shown slight improvement in her symptoms.  Tr. 1212.  Dr. Wills reported the following clinical findings: irritability; hearing a voice telling her to "kill herself;" sadness; poor sleep; impatience; mood lability; yelling a lot when stressed; anhedonia; nightmare every night; overly vigilant; and paranoia.  Tr. 1221.  Dr. Wills indicated that Brown's prognosis was "guarded to fair."  Tr. 1212.

7

In the February 10, 2012, Medical Source Statement, Dr. Wills rated Brown's mental abilities and aptitudes needed to do unskilled, semi-skilled and skilled work, and particular types of jobs. Tr. 1214-1215. There were a total of 25 categories rated, with rating choices of "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function." Tr. 1215.

Dr. Wills rated Brown's ability as "unable to meet competitive standards" in 3 categories: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) interact appropriately with the general public; and (3) maintain socially appropriate behavior. Tr. 1214-1215. Dr. Wills rated Brown's ability as "seriously limited, but not precluded" in 12 categories: (1) maintain attention for two hour segments; (2) maintain regular attendance and be punctual within customary, usually strict tolerances; (3) work in coordination with or proximity to others without being unduly distracted; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (6) respond appropriately to changes in a routine work setting; (7) deal with normal work stress; (8) be aware of normal hazards and take appropriate precautions; (9) understand and remember detailed instructions; (10) carry out detailed instructions; (11) deal with stress of semiskilled and skilled work; and (12) use public transportation. Tr. 1214-1215. Dr. Wills rated Brown's ability as "limited but satisfactory" in 6 categories: (1) remember work-like procedures; (2) sustain an ordinary routine without special supervision; (3) make simple work-related decisions; (4) perform at a consistent pace without an unreasonable number and length of rest periods; (5) set realistic goals or make plans independently of others; and (6) travel in unfamiliar places. Tr. 1214-1215. Dr. Wills rated Brown's ability as "unlimited or very good" in 4 categories: (1) understand and remember

8

very short and simple instructions; (2) carry out very short and simple instructions; (3) ask

simple questions or request assistance; and (4) adhere to basic standards of neatness and

cleanliness.  Tr. 1214-1215.

> Dr. Wills offered the following explanation for her findings noted above:

> She can't focus consistently due to voices telling her to kill herself.  She is overly
> vigilant, paranoid, hears voices and intentionally hit a fellow commuter in the
> head [with] her . . . purse on the crowded bus today because he tripped over her
> child (3yo).  The bus driver counseled her instead of calling the police.  She said
> if placed in the same situation she probably would do the same thing.

Tr. 1215.  Dr. Wills also opined that Brown's impairments or treatment would cause her to be

absent more than 4 days each month.  Tr. 1215.

### a.  Consultative examining psychologist

On March 4, 2011, David V. House, Ph.D., conducted a consultative psychological

evaluation and set forth his results and opinions in a report.  Tr. 928-935.  Following his

evaluation, Dr. House's diagnoses included mood disorder, secondary to HIV infection with

depressive features, and posttraumatic stress disorder.  Tr. 933-934, 935.

Dr. House opined that Brown's ability to understand, remember and follow instructions

did not appear to be limited.  Tr. 934.  Dr. House opined that Brown was moderately limited in

her ability to: maintain attention and concentration, persistence and pace, and to perform simple

repetitive tasks due to depressive features and posttraumatic stress;  and relate to others,

including fellow workers and supervisors, noting that Brown was somewhat socially isolated but

not agoraphobic.  Tr. 934.  Also, Dr. House opined that Brown's insight into her current situation

and her overall level of judgment was moderately limited.  Tr. 934.  Dr. House opined that

Brown was markedly limited in her ability to withstand stress and pressure associated with day-

to-day work activities, primarily due to some aspects of posttraumatic stress, such as aspects of

depersonalization, and mood swings; and in her level of adaptability, noting that Brown's emotional condition was related to a chronic health condition.  Tr. 934.

Dr. House assessed a GAF of 43, noting that his GAF assessment was based on Brown having, at times, intense symptoms of depersonalization and mood swings. Tr. 935.  He indicated that, at the time of his evaluation, Brown demonstrated serious impairment in terms of employability.  Tr. 935.

### b.  State agency reviewing psychologist

*David Dietz, Ph.D.*

On March 19, 2011, state agency reviewing psychologist David Dietz, Ph.D., conducted a review of Brown's file and completed a Psychiatric Review Technique (Tr. 115-117) and Mental RFC (Tr. 117-119).  In the Psychiatric Review Technique, Dr. Dietz opined that Brown had mild limitations in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 116.

In the Mental RFC, Dr. Dietz found that Brown had no limitations in the area of "understanding and memory."  Tr. 117.  Dr. Dietz found limitations in the areas of "sustained concentration and persistence," "social interaction," and "adaptation."  Tr. 117-119.

In the area of "sustained concentration and persistence," Dr. Dietz found Brown to be moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods;  and complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; but not significantly limited in her ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine

without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. Tr. 117-118. Dr. Dietz explained that, while Brown appeared to have some problems with concentration, she was able to conduct her activities of daily living and care for her children and she did not have any episodes of decompensation nor was she taking psychiatric medication. Tr. 118.

In the area of "social interaction," Dr. Dietz found Brown to be moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes; but not significantly limited in her ability to ask simple questions or request assistance; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 118. Dr. Dietz explained that Brown did appear to have issues interacting with others on more than a superficial basis but, at that time, a lot of her social isolation appeared to be related to her difficulty walking rather than her psychological symptoms. Tr. 118.

In the area of "adaptation," Dr. Dietz found that Brown was moderately limited in her ability to respond appropriately to changes in the work setting but not significantly limited in her ability to be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals  or make plans independently. Tr. 118-119. Dr. Dietz explained that Brown appeared to struggle to some degree with change. Tr. 119.

In rendering his opinion, Dr. Dietz considered Dr. House's opinion and found that:

> The CE offers the diagnosis of PTSD, however there is no support for this diagnosis, it appears that he made the diagnosis with the traumatic event being the diagnosis of HIV, this is an inappropriate use of the diagnosis.  Furthermore, the CE appears to have considered physical limitations when assessing her psychological abilities.

Clmt appears to be capable of completing 3 to 4 step tasks that do not have strict production standards or schedules in an environment that does not require more than superficial social interactions.

Tr. 119.

*Carl Tishler, Ph.D.*

On July 19, 2011, on reconsideration, state agency reviewing psychologist Carl Tishler, Ph.D., conducted a review of Brown's file and completed a Psychiatric Review Technique (Tr. 141-142) and Mental RFC (Tr. 144-146).  Dr. Tishler's opinion was substantially similar to Dr. Dietz. *Compare* Tr. 141-142, 144-146 *with* Tr. 115-119.   When explaining his opinion regarding Brown's Mental RFC, Dr. Tishler, like Dr. Dietz, did not find Dr. House's consultative examining psychologist's opinion wholly supportable.  Tr. 146.  Also, like Dr. Dietz, Dr. Tishler opined that "Clmt appears capable of completing 3 to 4 step tasks that does not require more than superficial social interactions."  Tr. 146.   Dr. Tishler, however, did not include Dr. Dietz's limitation of no "strict production standards or schedules."  *Compare* Tr. 146 *with* Tr. 119.

**C.     Testimonial evidence**

**1.     Plaintiff's testimony**

Brown was represented and testified at the administrative hearing.  Tr.  40-66, 69-76, 87-88.  Brown's medications included Prozac and she had recently started taking Abilify to address the voices that she reported she was continuing to hear, including voices telling her to kill herself.  Tr. 46, 74-75.  Brown stated that she was interested in having her doctor increase her Prozac dosage because she was still feeling depressed.  Tr. 47-48, 52.  She noted that her children had just been returned to her and she was trying to deal with her three-year-old's behavioral issues.  Tr.  48.  Also, she reported that overall, she has a difficult time dealing with her children's behavior, their talking back, and their lying.  Tr. 71.  She snaps at them, and

screams and yells or uses a belt on them.  Tr. 71.  Brown discussed a recent incident on a bus involving her three-year-old son and an altercation with another passenger.  Tr. 48, 71.  A man had pushed her son over on the bus and she responding by hitting him with her purse.  Tr. 48, 71.  She also reported having altercations with other people in the past, including her sister and someone at a prior job.[9]  Tr. 71-72.

Brown indicated that some of her depression comes from the fact that she really does not have anyone around to help her.  Tr. 52.  Her mother took care of Brown's children while they were removed from Brown's home but her mother works and has told Brown it is time that she grows up and be a mother.  Tr. 52-53.  Brown was receiving no help or financial assistance from her children's fathers.[10]  Tr. 53.

Brown indicated that she has a difficult time concentrating.  Tr. 72-73.  Sometimes people will be talking to her and asking her questions and she does not focus well, starts talking about something else, or spaces out.  Tr. 73.  She reported losing interest in things such as skating and going to the movies when she found out in 2006 that she was HIV positive.  Tr. 73.  After her HIV diagnosis, Brown reported gaining in excess of 100 pounds over the period of a year.  Tr. 73-74.

Brown believes that people are out to get her.  Tr. 74.  For example, when she is at a store, she will let people walk in front of her because she is afraid that they are going to hit her.  Tr. 74.  Also, her house has been broken into before, so she is unable to sleep at night.  Tr. 74.

Brown saw a social worker through the Economic Opportunity in Greater Cleveland in 2011 for about 2 months.  Tr. 55-56.  In August 2011, Brown started seeing someone at Berea

---

[9] When working one job, she had an incident with an individual and ended up having to resign her position.  Tr. 72.

[10] Her daughter's father had been paying child support but stopped in October 2011.  Tr. 53.

Children and Family Services.  Tr. 56-57.  Thereafter, in October 2011, she began seeing Dr. Wills and a counselor through Catholic Charities.  Tr. 56-58.

Brown indicated that she would be unable to perform her part-time work as a daycare worker because of her mental health issues.  Tr. 66.  She noted, "I can't even deal with my own three kids, so how can I care for somebody else's kids right now?"  Tr. 66.  She also reported that, with her physical and mental conditions, she did not think that she could perform a job with her physical and mental conditions five days a week, eight hours a day.  Tr. 75.  She stated that she did not feel her Prozac was helping and she had only recently been prescribed Abilify.  Tr. 75.  She also indicated that she did not believe that she would be able to deal with the public or people in a work-like setting because she was, at that time, thinking about hurting a lot of people because of what people had done to her with respect to her being HIV positive.  Tr. 75.

### 2.      Vocational Expert's testimony

Vocational Expert ("VE") Kevin Yi testified at the hearing.  Tr. 66-69, 76-87.  The VE described Brown's daycare worker position as a semi-skilled, light job.  Tr. 67.

For her first hypothetical, the ALJ asked the VE to assume a younger individual with a limited education and with the same vocational profile as Brown who can lift or carry 20 pounds occasionally; 10 pounds frequently; can sit at least 6 hours in an 8-hour day, with normal breaks, meaning about every 2 hours; can stand or walk at least 6 hours in an 8-hour day, with normal breaks, meaning about every 2 hours; cannot climb any ladders, ropes, or scaffolds, but can perform all other postural maneuvers on a frequent basis; can only occasionally reach overhead with both arms and can only occasionally work above shoulder level with both arms; should avoid concentrated exposure to vibration so no working on vibrating surfaces or with vibrating hand-held tools; must avoid work at unprotected heights or around hazards; can understand,

remember and carry out simple instructions, routine or repetitive tasks, and some detailed instructions or tasks, but no highly technical or complex instructions or tasks; can only perform low-stress work, meaning no high production or rapid production quotas; can perform work with only superficial interaction with co-workers and supervisors; and work is limited to work with no intense interpersonal aspects, meaning no arbitration, negotiation, confrontation, no managerial responsibilities and no responsibilities for the safety of others.  Tr. 76-77.

The VE indicated that the individual described in the first hypothetical would be unable to perform Brown's past work but the described individual would be able to perform other jobs, including (1) mailroom clerk,[11] an unskilled, light level job with about 60,000 jobs available nationwide and 2,500 in the state of Ohio; and (2) final inspector, an unskilled, light level job with about 60,000 jobs available nationwide and 2,500 in the state of Ohio.  Tr. 78.  In response to questioning from Brown's counsel, the VE indicated that both the mailroom and final inspector jobs would have production requirements but not high production requirements.  Tr. 79-80.  Thus, those jobs would remain available to the individual described in the first hypothetical who would be precluded from jobs with high production quotas.  Tr. 80.

For her second hypothetical, the ALJ asked the VE to assume the same individual as described in her first hypothetical except that the individual can only lift or carry 10 pounds occasionally and small objects frequently.  Tr. 80.  The VE indicated that the individual described in the second hypothetical would be unable to perform Brown's past work but there were jobs that the described individual could perform, including (1) bench worker, an unskilled, sedentary level job with about 16,000 jobs available nationwide and about 700 in the state of Ohio; (2) lab weight tester, an unskilled, sedentary level job with about 12,000 available nationwide and about 700 in the state of Ohio; and (3) final assembler, an unskilled, sedentary

---

[11] The VE indicated that the mailroom clerk position would be in an office not a post office.  Tr. 78.

level job with about 25,000 available nationwide and above 1,000 in the state of Ohio.[12]  Tr. 81-82.

In response to questioning from Brown's counsel, as modified by the ALJ,[13] the VE indicated that, if the individual described in the second hypothetical was also only able to sit for approximately 2 hours in an 8-hour workday day and stand and/or walk about 2 hours in an 8-hour workday, there would be no jobs available for the described individual.  Tr. 83-85.  The VE indicated that, if the individual described in the second hypothetical could either sit or stand for 8 hours but needed a job that allowed her to shift from sitting to being on her feet or from being on her feet to sitting at will, there would be sedentary jobs available to the individual.  Tr. 85. However, if every 30 minutes, the hypothetical individual had to walk for 5 minutes, the individual would be leaving their workstation and there would be no sedentary jobs available. Tr. 87.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

---

[12] For the final assembler job, the VE indicated that the job numbers provided were reduced to account for the fact that some final assemblers use a hand tool with vibration and some require high or rapid production.  Tr. 82.

[13] The ALJ indicated that she does not allow counsel to ask questions that go to employability.  Tr. 85.  Thus, she did not allow counsel to ask questions regarding employability where someone would be off task for a certain percentage of time or where someone would be absent for a certain number of days.  Tr. 84-85.

experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[15] the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 10, 2013, decision, the ALJ made the following findings:[17]

1. Brown met the insured status requirements through September 30, 2013. Tr. 13.

2. Brown had not engaged in substantial gainful activity since the alleged onset date.  Tr. 13.

3. Brown had the following severe impairments: paraspinal abscess in lumbar spine, asymptomatic human immunodeficiency virus (HIV) infection, mood disorder secondary to HIV infection, posttraumatic stress disorder, and obesity.  Tr. 13.

4. Brown did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14-16.

5. Brown had the RFC to perform light work with restrictions – Brown could lift and carry up to 20 pounds occasionally and 10 pounds frequently; in an 8-hour workday, she could stand or walk for at least 6 hours and sit for at least 6 hours; she could not climb ladders, ropes, or scaffolds, but could perform all other postural maneuvers on a frequent basis; she could reach overhead bilaterally occasionally; she could work above shoulder level bilaterally occasionally; she must avoid concentrated exposure to vibration, e.g., no work on vibrating surfaces or using vibrating tools; she must avoid unprotected heights and workplace hazards; she could understand, remember and carry out simple instructions, routine and repetitive tasks, and some detailed instructions or tasks, but no complex or highly technical instructions or tasks; she could only perform low-stress work, i.e., no high production or rapid production quotas; she could perform work with only superficial interaction with co-workers and supervisors; she could not perform work

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[17] The ALJ's findings are summarized.  The ALJ made findings with respect to the doctrine of *res judicata* under *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997) with respect to a prior ALJ decision dated June 23, 2009. Tr. 10-11, 13.  Brown does not take issue with the ALJ's *Drummond* findings.

involving intense interpersonal aspects, i.e., no arbitration, negotiation, confrontation, managerial responsibilities or responsibilities for the safety of others.  Tr. 16-23.

6.  Brown was unable to perform any past relevant work.  Tr. 24-25.

7.  Brown was born in 1984 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 25.

8.  Brown had at least a high school education and was able to communicate in English.  Tr. 25.

9.  Transferability of job skills was not material to the determination of disability.  Tr. 25.

10.  Considering Brown's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Brown could perform, including mail clerk and final inspector.  Tr. 25-26.

Based on the foregoing, the ALJ determined that Brown had not been under a disability from June 20, 2009, through the date of the decision.  Tr. 26.

## V. Parties' Arguments

Brown's sole contention is that the ALJ failed to properly evaluate the opinion of her treating psychiatrist Dr. Wills under the treating physician rule.  Doc. 17, pp. 10-14.  In response, the Commissioner argues that substantial evidence supports the ALJ's mental RFC finding and the ALJ adhered to the treating physician rule when evaluating Dr. Wills' opinion.  Doc. 19, pp. 7-13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Brown's sole challenge relates to the weight the ALJ assigned to the opinion of her treating psychiatrist Dr. Wills dated February 10, 2012.  Doc. 17, pp. 10-14.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).   If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In

deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Brown contends that the ALJ did not comply with the treating physician rule and "simply discounted portions of Dr. Wills' opinion while accepting the least restrictive limitations contained in Dr. Wills' assessment."  Doc. 17, p. 12.  She argues that the ALJ erred because she did not determine whether Dr. Wills' opinion was "well-supported by clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence of record;" did not apply the factors under 20 C.F.R. § 404.1527(c) when determining how much weight to provide Dr. Wills' opinion; and the ALJ's reasons for rejecting portions of Dr. Wills' opinion were insufficient.  Doc. 17, pp. 12-13.

In reaching her decision, the ALJ considered the entirety of the record, including Dr. Wills' February 10, 2012, opinion regarding Brown's functional limitations (Tr. 21).[18]  Tr. 10-26.  When considering Dr. Wills' opinion, the ALJ explained the weight provided to Dr. Wills' opinion and the reasons for the weight assigned, stating:

> I gave weight to Dr. Wills' opinions to the extent that they establish that Ms. Brown has limitations in her ability to understand, remember and carry out complex tasks, deal with work stresses, relate appropriately with others in the workplace, and maintain concentration, persistence or pace.  I do not accept Dr.

---

[18] The ALJ also considered the questionnaire completed by Dr. Wills on October 21, 2011.  Tr. 20-21.  Brown identifies Dr. Wills' February 10, 2012, Medical Source Statement as the relevant opinion.  Doc. 17, p. 11.

> Wills' opinion that Ms. Brown is unable to interact appropriately with the general public or that she is unable to maintain concentration, persistence of [sic] pace. Ms. Brown's ability to use public transportation, shop and work as a child care provider at least through 2011 demonstrates the ability to engage in at least superficial social interactions with the public.  Ms. Brown's ability to maintain her household, prepare meals, care for her young children, and work part-time as a childcare provider in 2010 and 2011 demonstrate the ability to maintain concentration, persistence and pace for at least simple, routine tasks.  I also note that Dr. Wills' assignment of a GAF score of 53, indicating moderate symptoms, is inconsistent with the severity of limitations Dr. Wills opines.  For these reasons, I did not give full weight to Dr. Wills' opinions.

Tr. 21.

Brown argues that, in *Gayheart*,[19] the Sixth Circuit recognized that there are two separate analyses involved in weighing a treating source's opinion and that the ALJ erred in this case because, before applying the factors under 20 C.F.R. § 404.1527(c), the ALJ did not first determine whether Dr. Wills' opinion should be given controlling weight by looking at whether Dr. Wills' opinion was "well-supported by clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence of record."  Doc. 17, pp. 11-12.  The Sixth Circuit in *Gayheart* did discuss there being two separate inquiries involved when determining the appropriate weight to be assigned to a treating source's opinion.  *Gayheart*, 710 F.3d at 376-377. However, *Gayheart* did not create a new interpretation of the treating physician rule.  *See Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F.Supp.3d 550, 55, 2014 WL 4660397, *4 (N.D. Ohio Sept. 17, 2014) (N.D. Ohio Sept. 17, 2014); *Nichols v. Colvin*, 2014 WL 7410024, *12 (N.D. Ohio Dec. 31, 2014)(noting, "[t]his Court has explained that *Gayheart* is not a new interpretation of the treating source doctrine, but instead reinforces the Sixth Circuit's prior holdings)(citing *Aiello-Zak*, 2014 WL 4660397, at  *4).  Further, courts have also indicated that, where an "ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for

---

[19] The Sixth Circuit decided *Gayheart* on March 12, 2013, after the ALJ's decision in this case issued.  Tr. 7 (ALJ's decision dated January 10, 2013).

discounting the opinion of a treating source, the Commissioner's decision will not be upset  by a failure to strictly follow the *Gayheart* template." *Aiello-Zak*, 47 F.Supp.3d at 558 (relying on *Dyer v. Soc. Sec. Adm.*, 568 Fed. Appx. 422 (6th Cir. 2014)); *see also Nichols*, 2014 WL 7410024, *12 (quoting *Aiello-Zak*, 2014 WL 4660397, at *5).

Even if the ALJ did not separate her treating physician analysis of Dr. Wills' opinion into two clearly distinct analyses, the ALJ's decision makes clear that the ALJ rejected certain portions of Dr. Wills' opinion because those severe limitations were inconsistent with other substantial evidence. Tr.  21.   The ALJ explained that she had provided weight to Dr. Wills' opinion to the extent that Dr. Wills' opinion established limitations in Brown's ability to understand, remember and carry out complex tasks, deal with work stresses, relate appropriately with others in the workplace, and maintain concentration, persistence or pace. Tr. 21.  The ALJ also explained that she was providing less than full weight, i.e., not controlling weight, to those portions of Dr. Wills' opinion that were not consistent with other evidence of record.  Tr. 21.  Brown challenges those reasons, arguing that the ALJ's reliance on evidence concerning her activities of daily living to reject portions of Dr. Wills' opinion was faulty because Brown has shown that she is unable to perform the activities cited by the ALJ on a sustained basis.  Doc. 17, pp. 12-13 (relying on *Gayheart*, 710 F.3d at 377).   More particularly, she contends that her part-time work as a child care worker under the supervision of her aunt does not show an ability to perform sustained competitive employment and, because her children were temporarily removed from her home by Children Services, she is unable to adequately care for her children on a sustained basis.[20]  Doc. 17, pp. 12-13.

---

[20] In her statement of facts, Brown references an incident in which she had recently hit someone on a bus.  Doc. 17, p. 2.  Brown, however, does not clearly challenge the ALJ's reliance on her ability to use public transportation based on this incident nor does Brown raise specific challenges to the ALJ's reliance upon or consideration of other activities of daily living, including her ability to shop, maintain her household, and prepare meals.  Also, she does

The ALJ explained that Brown's ability to work as a part-time child care worker and care for her children was inconsistent with Dr. Wills' opinion because "Ms. Brown's ability to . . . work as a child care provider at least through 2011 demonstrates the ability to engage in at least superficial social interactions with the public [and] Ms. Brown's ability to  . . . care for her young children, and work part-time as a childcare provider in 2010 and 2011 demonstrate the ability to maintain concentration, persistence and pace for at least simple, routine tasks."  Tr. 21.   The ALJ did not conclude that Brown's activities of daily living supported no mental limitations. Rather, the ALJ concluded that Brown's mental limitations were not as restrictive as those suggested by Dr. Wills.

In *Gayheart*, the Sixth Circuit concluded that the record did not support that the activities cited by the ALJ as being inconsistent with a treating source's opinion were activities that the claimant could perform on a sustained basis.[21]  *Gayheart*, 710 F.3d at 377 (indicating that, "[s]ocial functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals") (citing 20 C.F.R. § 404.1520a(c)(2) and quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00).  However, in *Dyer,* decided after *Gayheart*, the Sixth Circuit continued to recognize that a claimant's daily activities can constitute substantial evidence that a claimant is not disabled.  *Dyer*, 568 Fed.Appx. at 427; *see also Aiello-Zak*, 47 F.Supp.3d at 559 (relying on *Dyer* for the proposition that "findings concerning a claimant's daily activities can be sufficient reason to accord less weight to contradictory conclusions in the opinion of a treating source").

---

not challenge the ALJ's other reason for assigning less than full weight to Dr. Wills' opinion, i.e., "Dr. Wills' assignment of a GAF score of 53, indicating moderate symptoms, is inconsistent with the severity of limitations Dr. Wills opines."  Tr. 21.

[21] The court also determined that the ALJ's examples of daily activities were taken out of context or offset by other examples in the record.  *Id.* at 378.

Brown's argument that, because her work as a child care worker was part-time and under the supervision of her aunt, the ALJ was precluded from considering that activity when evaluating the weight to assign to Dr. Wills' opinion is without merit.  As discussed above, an ALJ is not precluded from considering a claimant's daily activities when weighing a treating source opinion.  *See Dyer*, 568 Fed.Appx. at 427; *see also Aiello-Zak*, 47 F.Supp.3d at 559. Further, Brown does not contend that, when working part-time, she was unable to sustain that activity.   To the extent that Brown suggests that the ALJ failed to take into account the fact that her children were removed from her home and that such removal demonstrates an inability to care for her children on a sustained basis, the Court finds that argument also without merit because, when considering Brown's mental impairment claim, the ALJ considered records discussing the temporary removal of Brown's children from her home.  Tr. 20 (referencing Exhibit 14F and Department of Child and Family Services mandated involvement of Catholic Charities mental health services).  Further, until the temporary removal of Brown's children, there was no indication that Brown was unable to care for her children[22] and, as acknowledged by Brown, at the time of the hearing, she had regained custody of her children.  Doc. 17, p. 13.

Brown also contends that the ALJ's decision is unsupported by substantial evidence because consultative examining psychologist Dr. House's opinion was consistent with and supports Dr. Wills' opinion.  Doc. 17, p. 13.  However, the opinions of Dr. House and Dr. Wills are not entirely consistent.  For example, Dr. Wills opined that Brown was unable to interact appropriately with the general public and unable to maintain socially appropriate behavior.  Tr. 1215.  In contrast, Dr. House opined that Brown was moderately limited in her ability to relate to fellow workers and supervisors, but was not agoraphobic or completely unable to interact

---

[22] For example, while working part-time in 2008, 2009, and 2010, Brown testified that she was able to get her oldest son to school, get her younger children to daycare, and get herself to work.  Tr. 63.

appropriately with the public or maintain socially appropriate behavior.  Tr. 934.  Moreover, the
ALJ considered Dr. House's opinion along with the other evidence of record and did not give the
opinion full weight, stating:

> I did not give full weight to Dr. House's opinion as it is based on a one-time
> examination and is inconsistent with the evidence as a whole.  Ms. Brown's
> presentation before Dr. House was different from her presentation during an
> initial evaluation at Murtis Taylor two months before.  Ms. Brown told Dr.
> Housse she could not perform serial seven subtractions, but performed them
> without difficulty at the Murtis Taylor evaluation.  She also demonstrated good
> concentration and appropriate judgment.  Although the record demonstrates some
> limitations in Ms. Brown's ability to withstand work stress and pressures and to
> adapt, her reported daily activities of living indicate greater capacity than Dr.
> House has opined.

Tr. 22.  Brown does not challenge the ALJ's consideration of or the weight assigned to Dr.
House's opinion nor has she shown or that the ALJ's rationale for the weight assigned to Dr.
House's opinion is not supported by evidence.

Although Brown acknowledges that the state agency reviewing psychologists' opinions
are inconsistent with Dr. Wills' opinions, she argues that the ALJ erred in weighing Dr. Wills'
opinion because the ALJ failed to identify any psychiatric evidence inconsistent with Dr. Wills'
opinion and also contends that "conflicting substantial evidence must consist of more than the
medical opinions of the non-treating and non-examining doctors."  Doc. 17, p. 13 (relying on
*Gayheart*, 710 F.3d at 377).   While not explicitly stating that the opinions of the state agency
reviewing psychologists were inconsistent with Dr. Wills' opinion, the ALJ discussed and
considered those opinions and the inconsistencies between those opinions are clear.  *Compare*
Tr. 21 (discussing Dr. Wills' opinions) *with* Tr. 22-23 (discussing the state agency reviewing
psychologists' opinions).  With respect to Brown's claim that substantial evidence must consist
of more than the medical opinions of non-treating/non-examining doctors, as discussed above,
when weighing Dr. Wills' opinion, the ALJ relied upon Brown's reported activities of daily

living as well as inconsistencies within Dr. Wills' own opinion.  Thus, the state agency reviewing psychologists' opinions were not the only evidence relied upon by the ALJ to support his decision.

As discussed, the ALJ considered and weighed Dr. Wills' opinion and explained her rationale for providing less than full weight to Dr. Wills' opinion.  Brown has not shown that the ALJ failed to provide sufficient explanation to allow for meaningful judicial review or that the ALJ's decision is not supported by substantial evidence.  Thus, while the ALJ could have stated more clearly which portions of her analysis regarding Dr. Wills' opinion fell under which of the two steps highlighted in *Gayheart* for analyzing treating physician opinions, the Court finds that the ALJ satisfied the procedural requirements of the treating physician rule and provided good reasons supported by substantial evidence for not providing full weight to Dr. Wills' opinion.  *See e.g., Aiello-Zak*, 47 F.Supp.3d at 560-561 (affirming ALJ decision even though ALJ's handling of a treating source opinion "was not a textbook model of *Gayheart* compliance").  To the extent that Brown relies on other evidence to support her contention that substantial evidence supports her disability claim, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Accordingly, even if this Court would have viewed the evidence differently, where, as here, "substantial evidence also supports the conclusion reached by the ALJ," even "if substantial evidence or indeed a preponderance of the evidence supports the claimant's position," the Court cannot overturn the Commissioner's decision.  *Jones*, 336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

July 20, 2015

_____
Kathleen B. Burke
United States Magistrate Judge